Leona Kurth Moore v. Commissioner. Ethel Kurth Haebler v. Commissioner.
Moore v. Commissioner
Docket Nos. 4066, 4079.
United States Tax Court
1946 Tax Ct. Memo LEXIS 255; 5 T.C.M. (CCH) 133; T.C.M. (RIA) 46056; February 28, 1946
Frederic Sammond, Esq. and T. C. Bolliger, Esq., 735 N. Water St., Milwaukee 2, Wis., for the petitioners. Harold H. Hart, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion These two proceedings which were consolidated for hearing and opinion involve *256 deficiencies in petitioners' income tax liabilities for the calendar year 1939. The two cases are identical in issues and facts. The respondent determined a deficiency of $70,951.57 against petitioner Leona Kurth Moore and $66,526.91 against petitioner Edith Kurth Haebler. The difference in the amounts of deficiency results solely from differences in undisputed taxable income of each petitioner, prior to adjustment. The question presented for decision is whether the reacquisition by a certain corporation in 1939 of all of its outstanding preferred stock consisting of 2,500 shares held by the petitioners, constituted a distribution in partial liquidation so that petitioners are taxable on 100 percent of their gain therefrom. The facts were presented to the court by stipulation, documentary evidence attached thereto, and oral testimony. The facts stipulated are found as stipulated. Findings of Fact The petitioners are individuals residing in Milwaukee, Wis., and filed their respective income tax returns for the calendar year 1939 with the collector of internal revenue for the district of Wisconsin at Milwaukee, Wis.
Each petitioner on December 27, 1939, owned 1,250 shares *257 of the 5 percent cumulative preferred stock of a par value of $170 per share of the Kurth Malting Company (hereinafter referred to as "the company"), a Wisconsin corporation, which she had held for more than twenty-four months prior thereto. The articles of organization of the company and the certificates evidencing this preferred stock contained no provision for its redemption by the corporation. At December 27, 1939, and for some time prior thereto, the company had outstanding 14,140 shares of common stock, owned as follows: Leona Kurth Moore (petitioner)
4,420.60
Ethel Kurth Haebler (petitioner)
4,371.85
Herbert C. Kurth (brother of peti-
tioners)
3,211.60
Estate of Amanda Kurth (Amanda was
mother of petitioners)
829.45
Chris Kurth, Jr. (cousin of peti-
tioners)
48.75
Wm. T. Haebler (husband of peti-
tioner. Mrs. Haebler)
48.75
First Wisconsin Trust Co., Trustee
(trustee under an agreement with
Herbert C. Kurth as settlor for his
minor children)
1,209.00
14,140.00
The entire outstanding preferred stock of the company as of December 18, 1939, which was held by the petitioners, was represented by the following certificates: Certificates
Shares
Ethel Kurth Haebler
#3
750
Ethel Kurth Haebler
4
500
Leona Kurth Moore
5
500
Leona Kurth Moore
6
250
Leona Kurth Moore
7
500
2,500
*258 In December 1939, a representative of petitioners approached Bingham, Sheldon & Co. (hereinafter referred to as "Bingham"), a licensed security dealer in Milwaukee, in which petitioners had no interest, and offered to sell Bingham the preferred stock owned by the petitioners. On December 18, 1939, a special meeting of the Board of Directors[1] of the company was held. The president of the company reported at this meeting that discussion had been had from time to time as to the propriety of acquiring the outstanding preferred stock and that because of the unwillingness of the petitioners to sell the stock to the company, the company had discussed with Bingham the possibility that Bingham buy the stock from the petitioners under an agreement to sell the stock to the company. [2] A tentative contract with Bingham was presented to the meeting. The Board approved the tentative agreement with Bingham and authorized and directed the company's officers to take all steps necessary to the acquisition of the stock from Bingham. *259 On December 18, 1939, the company and Bingham entered into an agreement providing that Bingham would endeavor to acquire the preferred stock, that in the event of such acquisition Bingham would sell the stock to the company on March 1, 1940 at par plus accrued and unpaid dividends, and that upon notice of the purchase of the stock by Bingham the company would deposit with the First Wisconsin National Bank of Milwaukee $425,000 plus accrued dividends to March 1, 1940. The agreement also stated that the company would deposit these monies with the bank with instructions to pay Bingham on January 1, 1940, an amount equal to accrued dividends to date, and to pay Bingham on March 1, 1940, the balance of the sum deposited upon receipt of the stock certificates. The agreement contained the following recital, among others: Whereas, the Purchaser (Bingham) is negotiating with the owners of said stock for the purchase and acquisition of the same, but is willing to acquire said stock only in the event that the Company enters into this agreement for the purchase of said stock upon the date hereinafter set forth; * * * Pursuant to this agreement, the company wrote a letter to the above-mentioned *260 bank on December 18, 1939 setting forth the steps which the bank should take in connection with the agreement. The letter was approved and accepted by the bank on December 27, 1939. The following transactions occurred pursuant to the agreement on December 27, 1939: a. Certificates 3 and 4 for 1,250 shares of preferred stock were delivered to Bingham by Ethel Kurth Haebler, and certificates 5, 6 and 7 for 1,250 shares were delivered to Bingham by Leona Kurth Moore. The certificates were endorsed in blank by the respective petitioners. Bingham delivered these certificates to the company and received from it a new certificate No. 10 for 2,500 shares in the name of Bingham. The company wrote "cancelled Dec. 27, 1939" in ink across the face of certificates 3, 4, 5 6 and 7. b. The First Wisconsin National Bank lent Bingham $427,951.38 at 2 percent on a note due March 1, 1940. c. Bingham issued two checks for $213,975.69 each, or a total of $427,951.38, and delivered them to the petitioners. The company deposited the sum of $433,854.16 with the bank on December 29, 1939. This sum equalled the par value of 2,500 preferred shares ($425,000) plus dividends thereon from October 1, 1939 to *261 January 1, 1940, of $5,312.50 and from January 1 to March 1940 of $3,541.66. [3]
The sum of $213,975.69 received by each petitioner from Bingham was for the following: Par value of 1,250 shares of preferred
stock
$212,500.00
Less 1/2 percent commission
1,062.50
211,437.50
Plus accrued dividend Oct. 1 to Dec.
27, 1939
2,538.19
$213,975.69
Bingham issued to each petitioner on December 27, 1939, a statement confirming the purchase by Bingham as principal of 1,250 shares of the preferred stock from each petitioner. Each petitioner purchased and cancelled revenue stamps in the amount of $106.25, covering Federal stock transfer tax on her transfer to Bingham. On February 5, 1940, another meeting of the board of directors of the company was held (petitioners not being present although directors at the time), and it was resolved that the company should *262 purchase the outstanding preferred stock from Bingham. It was further resolved "that until further action by the Board of Directors * * * this stock shall remain as treasury stock, unretired." Bingham carried the stock on its books as an asset until its transfer on March 1, 1940 and on December 31, 1939 reported the stock to the Wisconsin Department of Securities as part of its inventory of securities on hand at that date. It is stipulated that the president of Bingham attended on its behalf a meeting of the stockholders of the company and voted as the owner of the 2,500 preferred shares on various matters which came before the meeting. However, certificate No. 10 held by Bingham contains on its reverse side an extract from the Articles of Organization of the company, as amended, expressly providing that preferred stock should have no voting rights except as required by statute or as provided by the Articles. The bank, on March 1, 1940, delivered certificate No. 10 to the company. On the same day Bingham furnished the company with a statement confirming the sale on that day by Bingham as principal to the company of the 2,500 preferred shares at par ($425,000) plus accrued dividends *263 of $3,541.66. Bingham purchased and cancelled revenue stamps amounting to $212.50 as the Federal stock transfer tax on the transfer. At the board of directors meeting on February 5, 1940, after "discussion as to the necessity of the retirement of all the outstanding preferred stock of the Company" by reason of the contract dated December 18, 1939 between Bingham and the company, it was resolved that "until further action by the Board this stock shall remain as treasury stock, unretired". However, upon receipt of certificate No. 10 from Bingham on March 1, 1940, a bookkeeper of the company made an entry in the company's books which had the effect of cancelling the preferred stock account. Petitioners maintain that this entry was an error on the part of the bookkeeper. On December 31, 1942, various entries were made in the company's books "as at March 1, 1940" to reestablish the "Capital Stock (Preferred)" account and to establish a "Treasury Stock Account" in the amount of $425,000. Petitioners assert that these entries were made in order to correct the bookkeeper's error. Also on or about December 31, 1942 a bookkeeper of the company wrote across the face of certificate No. 10 *264 "Surrendered for reissue March 1, 1940 and reissued as treasury stock". Preferred stock certificate No. 13 was issued to the company on or about December 31, 1942 and on the stub in the company's preferred stock certificate book the date of issue is shown "December 31, 1942 as at March 1, 1940". The same firm of certified public accountants prepared the company's annual audit reports each year from 1935 on. The audit reports for the calendar years 1935 thru 1942, inclusive, show the following with respect to the preferred stock of the company: Date of Bal.
Date of Supp'l
Balance Sheet Comments
Year Ended
Sheet Audit
or Final Audit
on Preferred Stock
12/31/35
2/21/36
1/24/36
Authorized and Outstanding 4,100 shares
12/31/36
2/ 2/37
1/25/37
Purchased and Retired 1,600 shares. Author-
ized 4,100 shares - Outstanding 2,500 shares
12/31/37
1/27/38
1/27/38
Authorized 4,100 shares. Issued and Outstand-
ing 2,500 shares
12/31/38
2/27/39
2/28/39
Authorized 4,100 shares. Issued and Outstand-
ing 2,500 shares
12/31/39
1/24/40
1/25/40
Authorized 4,100 shares. Issued and Outstand-
ing 2,500 shares
12/31/40
1/29/41
1/31/41
Authorized 4,100 shares. Outstanding None
12/31/41
2/11/42
2/13/42
Authorized 4,100 shares. Outstanding None
12/31/42
2/19/43
2/20/43
Treasury Stock-Preferred $425,000 shown as
an asset. Issued Preferred Stock $425,000.00
shown as a credit.
*265 In the audit reports dated January 24, 1940 and January 25, 1940 covering the year ended December 31, 1939, the following asset is set forth as of December 31, 1939: Cash on Deposit under Escrow Agree-
ment for the purchase and re-
tirement of all the outstanding
Preferred Stock, together with Ac-
crued Dividends to March 1, 1940
$433,854.16
In the texts of the audit reports for the calendar years 1939 through 1942, inclusive, the following statements were made in regard to preferred stock: (a) Audit report dated January 25, 1940 covering year ended December 31, 1939: We confirmed the balance in this account by a certificate from the First Wisconsin National Bank. The cash was deposited in escrow in December, 1939, to provide for the retirement in 1940, at par plus accrued dividends, of all the Company's outstanding Preferred Stock. (b) Audit report dated January 31, 1941 covering year ended December 31, 1940: On March 1, 1940, the Company purchased and placed in its treasury all of the preferred stock then outstanding consisting of 2,500 shares having a total par value of $425,000.00. (c) Audit report dated February 13, 1942 covering year ended December 31, 1941: *266 History and Organization The Kurth Malting Company, a Wisconsin corporation, was organized October 28, 1915, and now has an authorized capital of $2,111,000.00, consisting of 4,100 shares of preferred stock, par value of $170.00 per share, and 14,140 shares of common stock, par value of $100.00 per share. At December 31, 1941, all of the authorized common stock was outstanding while the preferred stock had all been retired in 1940 and prior years. (d) Audit report dated February 20, 1943 covering year ended December 31, 1942: History and Organization The Kurth Malting Company, a Wisconsin corporation, was organized on October 28, 1915, and now has an authorized capital of $2,111,000.00 consisting of 4,100 shares of 5% cumulative preferred stock, par value $170.00 per share, and 14,140 shares of common stock, par value $100.00 per share. At December 31, 1942 all of the authorized common stock was outstanding, while the preferred had all been reacquired in previous years. The Treasury holds 2,500 shares of the preferred pending resale. The preferred stock was not shown on the balance sheet as outstanding because the accounting firm employed by the company considered "outstanding *267 stock" as stock outstanding in the hands of the public. Although the entries made in the company's books and in the balance sheet did not conform to conventional accounting practice, the accounting firm did not ask the company to change the entries since it did not consider the matter of great importance. On December 3, 1943, the Board of Directors of the company authorized its officers to sell the preferred stock in the treasury and in the following year the 2,500 shares of preferred stock so held were sold to Yale University at par for cash. Opinion KERN, Judge: The question at issue is whether the amounts received by petitioners for their preferred stock were amounts distributed to them in partial liquidation of the company. Respondent's contention is that these sums constituted distributions in partial liquidation and that under the law in effect at the time, the petitioners are taxable on 100 percent of their gains therefrom. Petitioners, on the other hand, maintain that the sales to Bingham were complete and that the fact that Bingham subsequently sold the stock to the company is immaterial. Arguing in the alternative, petitioners urge that even though they be regarded *268 as having transferred their stock to the company, the amounts which they received therefor were not distributions in redemption or cancellation of their preferred stock. Section 115 (c) of the Internal Revenue Code provides that amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock, and that the gain so recognized shall be considered as a shortterm capital gain. Section 115 (i) defines "amounts distributed in partial liquidation" as a distribution by a corporation in complete cancellation or redemption of a part of its stock. [4] Short-term capital gains are taxable 100 percent under section 117 of the Code (applicable to the calendar year 1939). *269 It is necessary that we view these transactions as a whole. A sale by one person can not be transformed for tax purposes into a sale by another merely by using the latter as a conduit through which to pass title. Commissioner v. Court Holding Company (1945), 324 U.S. 331. We do not consider the sales by the petitioners to Bingham to have been "bona fide unrestricted" sales "in fact". See Clara M. Tully Trust, 1 T.C. 611, 621. In that case we held for the taxpayer but pointed out that the sale of stock to brokers prior to retirement was entirely unrestricted, that the purchaser was bound by no commitments and was free to do with the property purchased whatever it desired. In the instant case Bingham acquired the stock only after it had entered into a binding commitment to sell it to the company within a few months' time. We do not consider it material that Federal stock transfer taxes were paid on the separate transfers from petitioners to Bingham and from Bingham to the company, and that Bingham apparently was treated by the company as the full owner of the stock while it held it. The case of W. P. Hobby, 2 T.C. 980, is distinguishable on *270 its facts. In view of the opinion of the Supreme Court in the Court Holding Co. case, supra, we are not disposed to extend the rule laid down in the Hobby case to facts such as are here present. We are now faced with the question of the intent of the company in acquiring the stock. In determining whether a partial liquidation has taken place, the controlling factor is the intent of the corporation in reacquiring its stock. George F. Jones, 4 T.C. 854, 857. If the company acquired the stock with intent to hold it as treasury stock, there was no partial liquidation within the meaning of section 115 (i), supra. See Alpers v. Commissioner (CCA-2, 1942), 126 Fed. (2d) 58, 60. We agree with respondent's argument on brief that the intent of the corporation as of the date of acquisition must be determined. There is no better evidence of the company's intent at the time it acquired the shares than the board of directors' resolution of February 5, 1940, that "until further action by the Board this stock shall remain as treasury stock, unretired". The other evidence before us is not sufficient to negate this declaration of corporate intention. We do not think that *271 under the facts before us we would be justified in concluding that the board merely by its failure to have the erroneous book entries and the erroneous statements in the audit reports promptly corrected, took the necessary "further action" to change the character of the stock from treasury stock. See Harold F. Hadley, 1 T.C. 496. We hold, therefore, that the sums received by petitioners for their preferred stock were not amounts distributed in partial liquidation, and that there are no deficiencies in the income tax returns for 1939 of the respective petitioners. Decision will be entered for the petitioners. Footnotes
1. The board of directors at this time apparently consisted of Herbert C. Kurth, Chris Kurth, Jr. and William T. Haebler. There is no evidence that the petitioners were members of the board at this time. ↩
2. In his opening statement counsel for petitioners said: "It appears they [petitioners] did not want to sell to the company. I don't believe we make any bones about it. They didn't want to sell if they had to pay the full tax rate, but did want to sell if they could sell for capital gain. They were disturbed the Government might make the claim that was made here if they sold directly to the company, so they sold to a security dealer."↩
3. In computing these dividends, the deduction and withholding of Wisconsin privilege dividend tax by the company was overlooked. Accordingly, Bingham paid the company $103.91 in January 1940 and $79.06 in March 1940 to reimburse the company for the dividend taxes paid by the company on these dividends.↩
4. Sec. 115. Distributions by Corporations (c) Distributions in Liquidation. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation * * * * *
(i) Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of a part of all or a portion of its stock.↩